UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| YOHAN BIC FLAME-BEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:21-cv-01986-SEB-TAB |
| | ) | |
| WEXFORD OF INDIANA, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART MEDICAL DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT AND DENYING OFFICER MOORE'S
MOTION FOR SUMMARY JUDGMENT**

Plaintiff Yohan Flame-Bey is currently incarcerated at New Castle Correctional Facility.

He alleges in this civil rights case that the defendants were deliberately indifferent to various

medical conditions. Specifically, Mr. Flame-Bey contends that Dr. Talbot, FNP Purdue, Dr.

Mitcheff, Nurse Steelmon, Dr. Knieser, Nurse Jones, Dr. Nwannunu, Nurse Greene, R. Schilling,

and Nurse Foy (the "medical defendants") refused to treat his parasites, that Dr. Nwannunu failed

to treat his headaches, that Dr. Talbot refused to treat his "heart issues," and that Nurse Jones failed

to treat his injured ankle. He also contends that Nurses Jones and Foy and Officer Moore retaliated

against him for filing grievances and that Officer Moore confiscated his legal and religious

property. For the reasons that follow, the medical defendants' motion for summary judgment, dkt.

[176], is **granted in part and denied in part** and Officer Moore's motion for summary judgment,

dkt. [167], is **denied**. In addition, Mr. Flame-Bey's motion to reply, dkt. [174], and motions to take judicial notice, dkt. [203], and dkt. [209], are each **denied**.

## I.
## Standard of Review

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

The Court notes that Mr. Flame-Bey filed two responses to the medical defendants' motion for summary judgment. The first was filed on November 16, 2023, along with a motion to excuse

the late filing of his summary judgment response. Dkt. 201. The Court granted that motion to the extent that the Court permitted filing of the attachments as the response to the motion for summary judgment and motion to take judicial notice. Dkt. 202. Then, on December 4, 2023, Mr. Flame-Bey filed a further response, which is 124 pages long and references 156 pages of exhibits. Dkt. 207, 208. Because the further response is not permitted by this Court's rules and additionally that response exceeds the Court's page limits, these subsequent filings have not been considered. *McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 787 (7th Cir. 2019) (district court may strictly enforce local summary judgment rules).[1]

## II.
## Motions to Take Judicial Notice

Mr. Flame-Bey has filed two motions to take judicial notice of facts in support of his response to summary judgment. Rule 201(b) of the Federal Rules of Evidence permits a court to take judicial notice of an adjudicative fact that is "not subject to reasonable dispute" because it:

(1) is generally known within the trial court's territorial jurisdiction; or

(2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

"Judicial notice is premised on the concept that certain facts or propositions exist which a court may accept as true without requiring additional proof from the opposing parties. It is an adjudicative device that substitutes the acceptance of a universal truth for the conventional method of introducing evidence." *GE Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1081 (7th Cir. 1997). Mr. Flame-Bey largely focuses his motions for judicial notice on evidence regarding

---

[1] In addition, Mr. Flame-Bey filed a motion for leave to reply to the defendants' response to his motion to compel while the motions for summary judgment were pending. That motion, dkt. [174], which discusses only general concerns with the defendants' discovery responses, is **denied** because it is not sufficient to show that those discovery responses were inadequate.

defendant Wexford's liability for his claim that Wexford maintained a policy, practice, or custom that caused his injuries. To support these claims, Mr. Flame-Bey cites filings in other cases in this Court. He further submits evidence he wishes the Court to consider, specifically, that a Vitamin B12 deficiency is a serious medical need and is caused by a parasitic infection, and that Albendazole is an anti-parasitic medication.

Mr. Flame-Bey's motions do not reference the type of evidence that is typically the subject of judicial notice. Instead, in support of his motion, he presents evidence in support of his claims that is typically filed in support of or in response to a summary judgment motion, and he asks the Court to take the facts as true. But Mr. Flame-Bey has not provided evidence to allow a conclusion that the "facts" for which he asks the Court to take judicial notice are not reasonably beyond dispute. Accordingly, the motions for judicial notice, dkts. [203] and [209], are **denied**.

### III.
### Factual Background

Because the defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Khungar*, 985 F.3d at 572–73.

#### A. Medical Care at Pendleton Correctional Facility

Mr. Flame-Bey asserts that, in April 2019, he asked a correctional officer to allow him to speak to someone in medical about something in his urine. Dkt. 176-2 at 97 (Flame-Bey Dep). He used a piece of toilet paper to pull the item out of the toilet and placed it on a soap dish. *Id.* Mr. Flame-Bey explains that Nurse Greene said, "that looks like a worm" and that she would return with a urine test, but she never came back. *Id.*

Mr. Flame-Bey saw Dr. Talbot on September 10, for abrasions on his legs, but Dr. Talbot noted that Mr. Flame-Bey wanted to submit a fecal sample that he said had two parasitic worms

in it. Dkt. 176-1 at 31-33 (Medical Records). Dr. Talbot noted that the sample appeared to contain fibrous strands. *Id.* He further noted that it did not show evidence of a roundworm or tapeworm, but that he would send it off for testing. *Id.*

A few days later, Mr. Flame-Bey was placed on suicide watch because he made suicidal threats if he was not seen by medical staff. *Id.* at 45-52. Jennifer Rewerts performed a suicide risk assessment and noted that Mr. Flame-Bey was having increased hallucinations and placed him on safety precautions in a stripped cell in the Restrictive Housing Unit ("RHU") to be evaluated by the psychiatrist for possible psychosis. *Id.* But he denied suicidal thoughts and she determined that his suicidality was not significant. *Id.*

Mr. Flame-Bey spent considerable time in the RHU. During that time, he was seen regularly by mental health professionals, had regular housing reviews, and continued to complain of parasites. *See generally id.* Mr. Flame-Bey also saw various doctors and nurses for his medical concerns. He was seen by a nurse on September 21 for heart pain. Dkt. 176-1 at 42-44. He complained that a parasite lives in his body and was hurting his heart. *Id.* He was advised that his vitals were stable, that this was not a cardiac issue, and that the doctor would be notified. *Id.*

He saw Dr. Levine for psychiatric care on September 27. *Id.* at 53-56. Dr. Levine noted he was referred for his complaints of parasites and his account that an officer threatened to put battery acid in this food. *Id.* Mr. Flame-Bey reported that about three years earlier, he noted unusual streaks in his feces, that the "streaks" had since expanded, and he was seeing worms ringing the entire fecal circumference and in his urine. *Id.* Dr. Levine reviewed Mr. Flame-Bey's mental condition and Mr. Flame-Bey refused medication for his psychological issues. *Id.* Dr. Levine concluded that Mr. Flame-Bey did not meet the criteria for involuntary treatment and advised him that he may

return if he desired treatment. *Id.* Dr. Levine assessed Mr. Flame-Bey with a "pain disorder related to psychological factors" and "delusional disorder." *Id.*

Mr. Flame-Bey saw a nurse on October 4 with complaints of parasites and requested a heart test. *Id.* at 67-68. The nurse noted that he had filled out multiple health care request forms stating he had worms and reported that a sergeant poured battery acid in his food. *Id.* The nurse noted that Mr. Flame-Bey had no difficulty eating and drinking and had no weight loss. *Id.* He was referred to mental health. *Id.*

FNP Purdue saw Mr. Flame-Bey on October 15 for rectal bleeding. *Id.* at 69-71. He brought a worm-like object in a box with him to the appointment. *Id.* She considered his complaints and ordered labs including CBC, CMP, and a stool culture. *Id.* FNP Purdue noted that she discussed this plan with the Regional Medical Director, Dr. Mitcheff. *Id.* Mr. Flame-Bey asserts that FNP Purdue told him to put a piece of tape on his buttocks to remove the parasites. Dkt. 176-2 at 79.

Dr. Talbot saw him about a week later for complaints of parasites in his body. Dkt. 176-1 at 81-83. Mr. Flame-Bey also complained of numbness in his legs and feet. *Id.* Dr. Talbot noted that Mr. Flame-Bey's stool test for ova and parasites from 2017 was negative and, after conducting a physical exam, Dr. Talbot found no indication of gastrointestinal parasites. *Id.*

Mr. Flame-Bey saw Dr. Talbot again a few days after that. *Id.* at 88-90. Dr. Talbot noted that Mr. Flame-Bey wanted the results of his lab tests, including those that indicated his h. pylori serum, and his 2017 stool sample, were negative. *Id.* Dr. Talbot noted that he suspected non-specific gastritis and ordered a short course of omeprazole.[2] *Id.* Mr. Flame-Bey was to have repeat amylase and lipase lab tests as well as a stool test. *Id.*

---

[2] Omeprazole is used to treat conditions where there is too much acid in the stomach. *See* Mayo Clinic, *Omeprazole*, https://www.mayoclinic.org/drugs-supplements/omeprazole-oral-route/description/drg-20066836#:~:text=Descriptions,back%20up%20into%20the%20esophagus. (last visited Mar. 14, 2024).

Mr. Flame-Bey saw Dr. Gray the next day and he continued to complain of parasites and his suspicion that his food had been contaminated with battery acid. *Id.* at 91-92. He was to continue to be monitored for possible somatoform or delusional disorder. *Id.*

Mr. Flame-Bey was next seen on October 31 and November 5 by nursing staff for his epigastric complaints and request for EKGs. *Id.* at 93-98. Mr. Flame-Bey's earlier lab results including the CBC were normal. *Id.* In addition, the h pylori, stool culture, and WBC were negative. *Id.* The ova and parasites test was unsuccessful and was reordered. *Id.*

On November 16 and 18, Mr. Flame-Bey underwent EKGs, which were normal. *Id.* at 105-07. Dr. Talbot saw Mr. Flame-Bey on November 19 for complaints of headaches and parasites in his body. *Id.* He was given a combination of aspirin and Tylenol for his headaches and referred again to mental health. *Id.*

Nurse Jennifer Steelmon saw Mr. Flame-Bey on December 4 for complaints of parasites, and she referred him to the provider. *Id.* at 110-11. Mr. Flame-Bey saw a non-party doctor on December 17. *Id.* at 112-14. He complained of parasites in his body that travel from his chest to his stool and urine. *Id.* The doctor noted his previous positive diagnosis for hallucinations of parasites and noted that his abdomen was tender, but otherwise normal. *Id.* The provider noted she would follow up with behavioral health related to his history of hallucinations and paranoia and would send Mr. Flame-Bey's urine for evaluation. *Id.*

Mr. Flame-Bey saw a nurse on January 16, 2020, complaining of pain all over his body. *Id.* at 121-22. He said, "[t]hey're crawling inside of me and I can feel them. Something is wrong." *Id.* Mr. Flame-Bey was scheduled to see the provider later in day, and the nurse noted that he had been seen several times regarding the "parasites" and all screens have been negative. *Id.* at 121-22.

Mr. Flame-Bey continued to have mental health visits, RHU reviews, and medical evaluation for complaints not related to his claims in this action. *Id.* at 123-252. He had a nurse visit on June 23, 2020, because of headaches. *Id.* at 253-55. The nurse considered his concerns and provided education. *Id.*

At a July 24, 2020, out of cell mental health review, Mr. Flame-Bey continued to complain of headaches and parasites. *Id.* at 283-85. He said he could feel the parasite traveling to his eyes and tips of his fingers and that he ate 7000 calories per day and felt fatigued if he did not. *Id.* He further stated that the only way his headaches went away was if beta brain waves are played at 300hz. *Id.* Mr. Flame-Bey continued to see mental health staff regularly throughout 2020. *Id.* at 286-322.

Mr. Flame-Bey saw Dr. Knieser on January 12, 2021. *Id.* at 323-24. During this visit, Dr. Knieser addressed his hypertension history and considered his concern about worms. *Id.* Dr. Knieser ordered a comprehensive metabolic panel, magnesium, serum, an ova and parasites test, and urinalysis. *Id*. Mr. Flame-Bey asserts that Dr. Knieser prescribed Albenza[3] for his parasites.

**B. Transfer to New Castle Correctional Facility**

Shortly after his visit with Dr. Knieser, Mr. Flame-Bey was transferred to New Castle Correctional Facility ("NCCF") and had an intake appointment on January 28, 2021. *Id.* at 360-65. He also continued to see mental health staff while he was at NCCF. *Id.* at 371-83.

On February 13, 2021, Mr. Flame-Bey saw Nurse Jones for a sick call visit where he complained of side effects from Albendazole which had been prescribed for parasites, and he

---

[3] Albenza is understood to be an abbreviation of Albendazole, a medication used to treat worms. Mayo Clinic, Albendazole (Oral Route), https://www.mayoclinic.org/drugs-supplements/albendazole-oral-route/side-effects/drg-20061505?p=1 (visited Mar. 20, 2024).

claimed the medication had not helped. *Id.* at 366-68. He was given containers to collect stool to be tested for ova and parasites. *Id.*

Mr. Flame-Bey saw Nurse Jones again two days later because he wanted someone to see what was in his stool. *Id.* at 369-70. When asked why he had not completed the sample previously provided, he said he could not because he has a bunk mate. *Id.* He was told that the samples needed to be collected, regardless of him having a bunk mate, so that they can be sent out for testing. *Id.*

Mr. Flame-Bey saw Nurse Jones again about a week later for a nurse visit for a labs and request for stool sample. *Id.* at 384-86. But during this visit, Mr. Flame-Bey refused to participate in the test, arguing that he should not have had to wait as long as he did and that he did not need a stool sample for parasites in his circulatory system. *Id.* Mr. Flame-Bey began to yell and curse at Nurse Jones. *Id.* Because of his combative behavior, Nurse Jones signed his refusal to receive care on his behalf. *Id*. Mr. Flame-Bey states Nurse Foy was there to draw his blood but Nurse Jones told him not to. Dkt. 176-2 at 95-96. Mr. Flame-Bey filed a grievance against Nurse Jones for allegedly falsifying the refusal form and to seek further treatment. *Id.*

Mr. Flame-Bey next saw Nurse Jones for headaches on March 9. Dkt. 176-1 at 390-93. Nurse Jones referred Mr. Flame-Bey to the provider. *Id*. After this visit, defendant Officer Moore searched Mr. Flame-Bey's cell and confiscated some of his property, including a video game, business, legal and religious materials, and the ova and parasite collection tubes. Dkt. 125 at 27. Mr. Flame-Bey alleges that Officer Moore told him, "that Jones had told him I'd filed a grievance on her so she'd had him come shake me down." *Id.* Mr. Flame-Bey further alleges that Officer Moore ordered him to cuff up and cuffed his wrists so tightly that they left marks and scarring. *Id.*

Mr. Flame-Bey saw Nurse Jones again about a week later complaining of side effects of Albenza, such as significant confusion. Dkt. 179-2 at 394-95. She reminded him that he was seen

for headaches on March 9, 2021, and that two doses of Albenza given 2 months prior would not suddenly now cause the symptoms he complained about at this visit. *Id.*

Mr. Flame-Bey saw Dr. Nwannunu on March 18 complaining of parasites. *Id.* at 396-97. Dr. Nwannunu diagnosed him with paranoid disorder and sought a psychiatric evaluation. *Id.* at 396-397. He saw Dr. Nwannunu again about a week later complaining of chronic headaches. *Id.* at 398-99. Dr. Nwannunu noted the headaches are on the right side of his head and were relieved with ibuprofen. *Id.* Dr. Nwannunu directed him to continue to obtain 600mg of ibuprofen from the commissary. *Id.*

Mr. Flame-Bey injured his ankle playing basketball on May 26, 2021. Dkt. 176-2 at 60-61. He returned to his housing unit and notified an officer, who told him she would alert Nurse Jones, but Nurse Jones took no action. *Id.* On May 26, Mr. Flame-Bey saw Nurse Jones for an annual nurse well visit. Dkt. 176-1 at 412-14. She reviewed his medical history and noted that he complained of randomized chest pains because of parasites and noted his psychiatric history of paranoia/delusions. *Id.* Nurse Jones did not address Mr. Flame-Bey's injury at this visit. Dkt. 176-2 at 62.

Mr. Flame-Bey saw Dr. Nwannunu on July 1, 2021, for a chronic care visit and Dr. Nwannunu changed his blood pressure medication. Dkt. 176-1 at 415-16. Mr. Flame-Bey saw Dr. Nwannunu two weeks later for a follow-up. *Id.* at 417-18. Mr. Flame-Bey also saw a nurse later that day complaining of needing emergency care to treat the parasites filling up his circulatory system. *Id.* at 419-20. He was provided a urine container to catch the parasites and he was referred to the provider. *Id.* Mr. Flame-Bey saw Dr. Nwannunu about a week after that, complaining of worms or parasites in his body. *Id.* at 421-22. Dr. Nwannunu's determined that Mr. Flame-Bey had paranoid disorder and recommended a further mental health evaluation. *Id.*

**IV.**

**Discussion**

Based on the Court's screening order, dkt. 15, the following claims are proceeding in this case:

- Eighth Amendment claim that Dr. Talbot, FNP Purdue, Dr. Mitcheff, Nurse Steelmon, Dr. Kneiser, Nurse Jones, Dr. Nwannunu, Nurse Green, R. Schilling, Scott Levine, Jennifer Steele, and John Foy refused to treat his parasites or seek medical assistance;

- Eighth Amendment claim that Nurse Jones and Dr. Nwannunu failed to provide him treatment for ongoing headaches;

- Eighth Amendment claim that Dr. Talbot refused to treat his heart issues;

- Eighth Amendment claim Nurse Jones failed to treat his injured ankle;

- First Amendment claim that Nurse Jones and John Foy retaliated against him for filing grievances by failing to provide him treatment;

- First Amendment retaliation claim that Officer Moore conducted a shakedown of his cell at Nurse Jones's direction because he had filed grievances; and

- First Amendment claims that Officer Moore confiscated his legal and religious property.

**A. Eighth Amendment Claims**

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

11

Deliberate indifference requires more than negligence or even objective recklessness. *Id.* Rather, Mr. Flame-Bey "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). "Of course, medical professionals rarely admit that they deliberately opted against the best course of treatment. So in many cases, deliberate indifference must be inferred from the propriety of their actions." *Dean*, 18 F.4th at 241 (internal citations omitted).

The Seventh Circuit has held that deliberate indifference occurs when the defendant:

- renders a treatment decision that departs so substantially "'from accepted professional judgment, practice, or standards as to demonstrate that'" it is not based on judgment at all. *Petties*, 836 F.3d at 729 (quoting *Cole v. Fromm*, 94 F.3d 254, 260 (7th Cir. 1996)).

- refuses "to take instructions from a specialist." *Id.*

- persists "in a course of treatment known to be ineffective." *Id.* at 729–30.

- chooses "an 'easier and less efficacious treatment' without exercising professional judgment." *Id.* at 730 (quoting *Estelle*, 429 U.S. at 104 n.10).

- effects "an inexplicable delay in treatment which serves no penological interest." *Id.*

Mr. Flame-Bey claims that his medical providers were deliberately indifferent to his parasitic infection, heart issues, headaches, and ankle injury.

### 1. Parasites

Mr. Flame-Bey alleges that defendants Dr. Talbot, FNP Purdue, Dr. Mitcheff, Nurse Steelmon, Dr. Kneiser, Nurse Jones, Dr. Nwannunu, Nurse Green, R. Schilling, Scott Levine, Jennifer Steele, and John Foy were deliberately indifferent to his parasites. The defendants argue that Mr. Flame-Bey never had a parasitic infection, instead suffered from delusional disorder. They further contend that they made significant efforts to address his needs.

Mr. Flame-Bey contends that he was diagnosed on two occasions with parasites. First, he asserts that FNP Purdue diagnosed him with parasites and told him to place a piece of tape on his buttocks to rid himself of the parasites. Dkt. 125 at 13. But Mr. Flame-Bey provides no support for his conclusion that NP Purdue "diagnosed" him with parasites. He simply contends that he told her that he had been urinating "worm-like entities" and FNP Purdue told him she would order tests and that he should use tape to remove them. *Id.* But he does not contend that she observed any parasites or that he did have testing at that time that revealed a parasitic infection. As FNP Purdue argues, any statement that Mr. Flame-Bey should use tape to remove parasites was unprofessional but does not amount to a diagnosis.

In addition, Mr. Flame-Bey states that Dr. Knieser diagnosed him with a parasitic infection on January 12, 2021. *Id.* at 24. Mr. Flame-Bey asserts that Dr. Knieser provided him a medication called Albenza before his transfer to NCCF. Dkt. 204 at 18. Mr. Flame-Bey was transferred to NCCF and had an intake appointment on January 28, 2021. Dkt. 176-2 at 360-65. He then had a sick call visit on February 13, 2021, complaining that the Albenza had not helped and that he had been given a device to collect samples for an ova and parasite test. *Id.* at 366-68. Dr. Knieser contends that the fact that he prescribed medication for a parasitic infection does not mean that he diagnosed Mr. Flame-Bey with that infection, but at most shows that he was providing a preventive treatment measure before a diagnosis could be made.

Mr. Flame-Bey further argues that he suffered from a Vitamin B12 deficiency and that such deficiency is extremely rare and could be caused by a parasitic infection. But, Mr. Flame-Bey has designated no evidence to demonstrate that his B12 deficiency was caused by a parasitic infection. Dkt. 204 at 12.

In short, Mr. Flame-Bey has no evidence that he suffered from parasites. Indeed, the evidence reflects that each of the defendants, and other medical providers, considered his complaints and examined him but none of them formally diagnosed him with parasites. Because he has not shown that he suffered from a serious medical need in this respect, the defendants are entitled to summary judgment on this claim.

### 2. Headaches

Next, Mr. Flame-Bey contends that Nurse Jones and Dr. Nwannunu failed to treat his headaches. Mr. Flame-Bey saw Nurse Jones and Dr. Nwannunu after he was transferred to NCCF.

When he saw Nurse Jones on March 9, 2021, she told him that his headaches could be a result of his hypertension and explained to him how to take his medication properly. Dkt. 176-2 at 390-93. She also referred him to the provider for additional assessment. *Id.* When she saw him again on March 15, 2021, she reminded him that she had just seen him and that he had been referred. *Id.* at 394-95. Mr. Flame-Bey then saw Dr. Nwannunu on March 25, 2021, regarding his headaches. *Id.* at 398-99. Dr. Nwannunu noted his chronic headaches and directed him to obtain 600mg ibuprofen from commissary as ibuprofen had provided relief for Mr. Flame-Bey's headaches. *Id.*

In short, Nurse Jones and Dr. Nwannunu considered Mr. Flame-Bey's headache complaints and addressed them. Mr. Flame-Bey has not shown that their actions, while they did not satisfy him, were such a departure from professional judgment that they were not actually based on medical judgment. *Petties*, 836 F.3d at 729 They are therefore entitled to summary judgment on this claim.

### 3. Heart Issues

Mr. Flame-Bey contends that Dr. Talbot failed to address his heart issues. But there is no evidence in the record that Dr. Talbot saw Mr. Flame-Bey for heart complaints or was aware of any such issues. Because Mr. Flame-Bey has failed to designate evidence that Dr. Talbot was aware of and disregarded any heart condition, Dr. Talbot is entitled to summary judgment on this claim.

### 4. Ankle Injury

Mr. Flame-Bey also contends that Nurse Jones failed to treat his injured ankle. Mr. Flame-Bey alleges that in May 2021, he injured his ankle playing basketball, that he told Nurse Jones about it, but she did not treat it. Dkt. 176-2 at 60-61.

Nurse Jones argues that Mr. Flame-Bey did not suffer a serious medical need when he injured his ankle. An objectively serious medical need is "one that has been diagnosed by a physician and that requires medical treatment, or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008) (internal quotations and citations omitted). While Mr. Flame-Bey did suffer an ankle injury which caused him pain, he has not demonstrated that this injury was one that required medical care or a doctor's attention, rather than over the counter treatment. Nurse Jones is therefore entitled to summary judgment on this claim.

### 5. Claims against Wexford

As discussed above, Mr. Flame-Bey has not demonstrated that any of the medical defendants were deliberately indifferent to his serious medical needs. Since he has not demonstrated a constitutional injury, he has failed to show that any Wexford policy, practice, or custom cause him injury. *See, e.g., Gaetiens v. City of Loves Park*, 4 F.4th 487, 495 (7th Cir. 2021)

15

(an entity cannot be liable under *Monell v. N.Y.C. Dept't of Soc. Servs.*, 436 U.S. 658 (1978) when there is no underlying constitutional violation by on of its employees).

### B. Retaliation

Mr. Flame-Bey further claims that Nurses Jones and Foy and Officer Moore retaliated against him for filing grievances. He asserts that when he saw Nurse Jones for headaches on March 9, 2021, Nurse Jones told Officer Moore to shakedown his cell because he had filed a grievance against her. Dkt. 125 at 27. He further contends that Nurses Jones and Foy denied him medical testing because of his grievances.

To succeed on a First Amendment retaliation claim, a plaintiff must come forward with evidence sufficient to allow a reasonable jury to conclude that: (1) the plaintiff engaged in protected First Amendment activity; (2) he suffered a deprivation that would likely deter future First Amendment activity; and (3) the protected activity was a motivating factor in the defendants' decision to take the allegedly retaliatory action. *Taylor v. Van Lanen*, 27 F.4th 1280, 1284 (7th Cir. 2022). If he does so, the burden shifts to the defendants to show that the deprivation would have occurred even if he had not engaged in protected activity. *Manuel v. Nalley*, 966 F.3d 668, 680 (7th Cir. 2020). If they can make that showing, the burden shifts back to the plaintiff to demonstrate that the proffered reason is pretextual or dishonest. *Id.*

The defendants do not dispute that Mr. Flame-Bey engaged in protected First Amendment activity by filing a grievance, so the Court focuses on the second and third elements.

### 1. Deprivation Likely to Deter First Amendment Activity

The defendants argue that Mr. Flame-Bey did not suffer a deprivation likely to deter future First Amendment activity.

First, they contend that cell shakedowns are common and not an action that would deter an ordinary person from First Amendment activity. But Mr. Flame-Bey contends not only that his cell was searched, but that his property was seized and destroyed. These are actions that a reasonable jury might conclude could deter future First Amendment activity.

Next, Mr. Flame-Bey contends that Nurse Foy denied him testing for parasites in retaliation for filing this lawsuit. Nurse Foy argues that because Mr. Flame-Bey was not harmed by the denial of the tests, this was not a deprivation likely to deter First Amendment activity. But "denial of medical treatment is a deprivation likely to dissuade a reasonable person from engaging in future First Amendment activity." *Perez v. Fenoglio*, 792 F.3d 768, 783 (7th Cir. 2015). The denial of medical treatment does not need to be serious enough to give rise to an independent Eighth or Fourteenth Amendment claim for deliberate indifference to medical treatment. *See, e.g., Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987) (recognizing a retaliation claim for denial of medical treatment even though lack of medical treatment (psychiatric treatment) did not establish independent deliberate indifference claim).

### 2. Motivating Factor

The defendants further argue that Mr. Flame-Bey cannot show that they were motivated by retaliatory animus. "The motivating factor [element] amounts to a causal link between the activity and the unlawful retaliation." *Manuel*, 966 F.3d at 680. This element may be proven by circumstantial evidence, which may include suspicious timing; ambiguous statements, behavior, or comments directed at others in the protected group; evidence that similarly situated people were treated differently; and evidence that the decisionmaker offered a pretextual reason for an allegedly retaliatory action. *Id.*; *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 643–44 (7th Cir. 2013); *cf. Nieves v. Bartlett*, 139 S. Ct. 1715, 1727 (2019) (probable cause usually defeats retaliatory arrest claim

but not if plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals who did not engage in the same sort of protected speech were not). Nonetheless, "[a]llegedly protected speech cannot be proven to motivate retaliation, if there is no evidence that the defendants knew of the protected speech." *Stagman v. Ryan*, 176 F.3d 986, 999– 1000 (7th Cir. 1999).

Mr. Flame-Bey states after the first grievance against Wexford, Nurses Jones and Foy refused to finish his February 2021 medical appointment. Dkt. 125 at 25-26. Nurses Jones and Foy argue that Mr. Flame-Bey was combative at this appointment and that is the reason they denied him care. In response to the motion for summary judgment, Mr. Flame-Bey does not designate evidence that he was not combative and that his behavior was not a valid reason to terminate the appointment. Accordingly, Nurses Jones and Foy have shown that they had a non-retaliatory reason not to provide Mr. Flame-Bey care that day, and Mr. Flame-Bey has failed to show that this reason was pretext. Accordingly, they are entitled to summary judgment on this particular retaliation claim.

Mr. Flame-Bey also alleges that Nurse Jones and Officer Moore retaliated against him when he had his March 9, 2021, appointment for headaches and Officer Moore shook down his cell and confiscated his property. Here, Mr. Flame-Bey's verified account that Officer Moore told him that his cell was being shaken down because he had filed a grievance is direct evidence of a retaliatory motive.[4] While Nurse Jones argues that there is no evidence that she had any authority

---

[4] Officer Moore denies telling Mr. Flame-Bey this and points out that Mr. Flame-Bey's grievance regarding the shakedown stated only his belief that it was done for racially discriminatory reasons. Dkt. 169-1 at 9. But for purposes of summary judgment, the evidence must be construed in the light most favorable to Mr. Flame-Bey as the non-movant. While Officer Moore has presented evidence that may cause a jury to disbelieve Mr. Flame-Bey, the Court cannot make such a credibility determination at summary judgment.

to order a shakedown, a reasonable jury could conclude that Officer Moore did in fact shake down Mr. Flame-Bey's cell on Nurse Jones's request.

The defendants are therefore not entitled to summary judgment on this retaliation claim.

### C. Other First Amendment Claims

Mr. Flame-Bey further alleged that, when he searched his cell and destroyed his property, Officer Moore violated his right to access to the courts and to practice his religion. Dkt. 15 at 4. Officer Moore did not seek summary judgment on these claims, and they shall continue to proceed.

**V.**
**Conclusion**

As discussed above, Mr. Flame-Bey's motion to reply to the motion to compel, dkt. [174], is **denied as moot**. His motions to take judicial notice, dkt. [203], and dkt. [209], are **denied**.

The medical defendants' motion for summary judgment, dkt. [176], is **granted in part and denied in part**. The motion is **granted** as to Mr. Flame-Bey's claims that the medical defendants were deliberately indifferent to his parasitic infection, headaches, heart issues, or ankle injury. Officer Moore's motion for summary judgment, dkt. [167], is **denied**.

The **clerk shall terminate** Wexford of Indiana, LLC, Michael Mitcheff, Paul Talbot, Martial Knieser, John Nwannunu, Elaine Purdue, Jennifer Steelmon, R. Schilling, Greene, Foy, and Scott Levine as defendants.

**The claims that shall proceed** are Mr. Flame-Bey's claim that Nurse Jones and Officer Moore retaliated against him. Further, Mr. Flame-Bey's claim that Officer Moore violated his right to access the courts and his right to practice his religion **shall proceed**.

The Court notes that, despite its efforts, service was not effective on defendant Jennifer Steele. Mr. Flame-Bey's claims against this defendant are that she was deliberately indifferent to his parasitic infection. Because the Court has found that it is not disputed that Mr. Flame-Bey did

not suffer from such an infection, pursuant to Rule 56(f) of the Federal Rules of Civil Procedure, he shall have **through April 16, 2024,** to show why she is also not entitled to summary judgment on this claim.

The **clerk shall include** a form motion for assistance with recruiting counsel with Mr. Flame-Bey's copy of this Order. If Mr. Flame-Bey wishes to request that the Court attempt to recruit counsel for the remainder of this case, he shall fill out this form and return it by **April 16, 2024**.

**IT IS SO ORDERED.**

Date:   3/22/2024

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

YOHAN BIC FLAME-BEY
148865
NEW CASTLE - CF
NEW CASTLE CORRECTIONAL FACILITY - Inmate Mail/Parcels
1000 Van Nuys Road
P.O. Box E
NEW CASTLE, IN 47362

All Electronically Registered Counsel